**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PRASHANT RAWAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 07 C 5561** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **UNITED AIRLINES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Prashant Rawal, a former employee of United Airlines, Inc., claims that United discriminated and retaliated against him based on his race, color, and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Before the court are (1) United's motion for summary judgment; (2) Rawal's motion to strike United's responses to his statement of additional facts; and (3) Rawal's motion to strike the declaration of Rudolph Stewart.

## I. FACTS

Rawal, a naturalized United States citizen, was born in India and raised and educated in the United States. (R. 65, Add'l Facts ¶1.) In January 2004 he applied for a position as a staff accountant at United. (R. 49, Facts ¶12.) Rawal is a certified public accountant with a master's degree (it's unclear in what field), and when he applied for the position he had more than eight years of accounting experience. (R. 65, Add'l Facts ¶2; R. 50, App'x, Tab 3C.) Craig Musa, manager of account compliance and analysis at United, interviewed and made the decision to hire Rawal. (R. 49, Facts ¶13.) Rawal was hired at grade-level "E," with a yearly salary of

-1-

$48,000, in February 2004. (*Id. ¶*14; R. 50, Tab 3D.) He began his employ in United's shared services group, with Musa as his direct supervisor. (*Id. ¶*14.)

Part of Rawal's job was to perform "reconciliations" on accounts—that is, he would validate an account's reported expenses by verifying them with independent records. Rawal regularly reconciled established accounts at United, but he also discovered hundreds of other accounts, which he either reconciled or assigned "ownership" to. (R. 65, Add'l Facts ¶3.) In performing these and other tasks, Rawal sent approximately 100 e-mails each week. (*Id. ¶*4.)[1]

Musa was charged with evaluating Rawal's performance; he wrote Rawal's mid-year and year-end performance reviews, including assessments of his performance in specific areas (like "communication" and "business acumen") and an overall rating. An employee could earn one of five ratings: outstanding (5); exceeds expectations (4); successful (3); needs improvement (2); or unsatisfactory (1). (R. 49, Facts ¶16.) If an employee's overall rating was "unsatisfactory" or "needs improvement," he would be placed on an "action plan" (also known as a "development plan"), with specific strategies to improve his performance. (R. 65, Add'l Facts ¶6.) And, typically, if an employee received a rating of "unsatisfactory" or "needs improvement," or if he was placed on an action plan, he would not be eligible for a promotion. (R. 49, Facts ¶55.)

---

[1] In response to Rawal's statement of additional facts, United disputed the notion that the 100 e-mails Rawal penned per week were in fact part of his job responsibilities. (R. 62, Resp. to Add'l Facts ¶4.) That response, among others, led Rawal to file a motion to strike United's responses to his statement of additional facts. (R. 107, Mot. to Strike Responses.) Rawal argues that United's responses include generic, unspecific, and purely argumentative denials, often without citing specific evidentiary materials. (*Id.* at 2.) The court has considered each of Rawal's arguments, and it has disregarded United's responses that do not comport with Local Rule 56.1(b). Accordingly, Rawal's motion to strike United's responses is DENIED as moot.

Rawal's Job Performance in 2004

In Rawal's first mid-year review, dated August 27, 2004, Musa gave him an overall rating of "needs improvement." Among other things, Musa wrote that "[m]ost objectives are on track toward completion but are taking longer to accomplish than expected," and that, given his experience, Rawal needed to "take more initiative in managing his assignments" rather than "waiting for direction." (*Id.* ¶¶17,18; R. 50, Def't's App'x 3W at 2.) On September 14, 2004, Musa gave Rawal a twelve-step action plan. (R. 49, Facts ¶20.) A month later, Musa supported Rawal's decision to obtain a master's degree in business administration; he also tried to obtain tuition reimbursements for Rawal's classes. (*Id.* ¶15.)

In Rawal's 2004 annual review, Musa evaluated his job performance from February 9, 2004 through December 31, 2004. Again, Musa gave Rawal an overall rating of "needs improvement." (*Id.* ¶32.) In the specific components of the evaluation, Musa gave Rawal "successful" ratings in six areas: adaptability, business acumen, customer focus, decision making, innovation, and teamwork. He gave Rawal a "needs improvement" rating in three areas: performance management, communication, and planning. (*Id.*; R. 67, Pl.'s App'x Exh. 5.) Musa noted that Rawal "is a team player who willingly participates in activities beyond his normal work assignments," and that he "is flexible to changing priorities" and "takes advantage of opportunities to enhance his knowledge and skills." Musa also wrote that Rawal's "communications on project status have definitely improved and I would continue to encourage him to provide regular updates." But Musa wrote that Rawal "[did] not consistently meet established objectives on timeliness, quality/quantity and resource management," and that there

had been "a number of situations in which the information [Rawal] provided/distributed contained inaccuracies." (R. 67, Pl.'s App'x Exh. 5.; R. 49, Facts ¶¶32-33.)

United has not highlighted much in the record to support Musa's claim that Rawal had an inconsistent record of meeting objectives, nor that he distributed inaccurate information in "a number of situations" in 2004. United points only to the fact that, of the many e-mails Rawal sent that year, two included acknowledgments that he had made mistakes. In an August 26, 2004 note to Musa and another United employee, Rawal apologized for needing to correct errors in a document he sent to them, explaining that he "was trying to rush." And, in a November 18, 2004 note, he apologized to four employees for mistakenly including cargo accounting and a duplicate account in his October variance report, noting that he would "try to do better next time." (R. 49, Facts ¶¶21, 22.) But the authenticity of Musa's impression, as reported in Rawal's annual review, is not in dispute. Rawal did not disagree with Musa's written comments; he disagreed with the overall rating of "needs improvement," which he believed did not adequately credit the work he had performed. (*Id.* ¶34.) Rawal thought—and still thinks—that Musa gave him the "needs improvement" rating to ensure that Rawal would stay in the shared services group. (*Id.* ¶35.)

Rawal's Complaints

Rawal did not receive his 2004 annual review until May 2005. (*Id.* ¶32.) Baffled by the overall rating, Rawal says he showed it to a business-school faculty member who mentioned that she knew someone on United's board of directors. Rawal says that he relayed the unnamed faculty-member's comments to Musa during a conversation about his annual review, and that he learned later that Musa had written that Rawal threatened to speak to Dipak Jain, an Indian

member of United's board of directors. Rawal says he did not use Dipak Jain's name during the conversation—indeed, he did not learn that a man named Dipak Jain even was on the board of directors until much later. (R. 64, Resp. to Facts ¶5; R. 67, Exh. 2 at 203-04.) Musa denies this. In a declaration following his deposition, Musa states that, "I did not infer that [Rawal] was talking about Dipak Jain when he referenced a United Board member in a conversation with me, and I did not make any comments about Dipak Jain to [Rawal]. In fact, it was [Rawal] who brought up Dipak Jain's name in a conversation with me." (R.50, tab 8 at 2.)

In May, Rawal relayed his concerns about the annual review to Krista Fischer, who worked in United's human resources department. (R. 49, Facts ¶38.) Rawal did not tell Fischer that he thought Musa's actions were discriminatory. (*Id.*)

Around the same time—between April and June 2005—Rawal also began raising concerns about Musa's accounting practices, which Rawal believed could violate the Sarbanes-Oxley Act. (R. 65, Add'l Facts ¶43.) Rawal became concerned because, he says, Musa ordered him to avoid selecting for monthly reconciliations accounts Musa controlled or of which he held "ownership," and forbade Rawal to "detail test" an account that Rawal had picked at random. (*Id.* ¶¶15, 43.) On June 28, 2005, Rawal sent an e-mail to Sara Fields, senior vice president at United, and Dave Wing, United's vice president controller, to express his concerns about the annual review, Musa's accounting practices, and his suspicion that Musa was retaliating against him for raising those concerns. (R. 49, Facts ¶39; R. 64, Resp. to Facts ¶39.)

Cynthia Starz, managing director for organizational strategies at United, along with Fischer, conducted an internal investigation of Rawal's annual review by interviewing Rawal and Musa and gathering the documents that Musa had considered. (R. 49, Facts ¶40.) On

August 10, 2005, in a letter drafted by Fischer and signed by Starz, Rawal was informed that the internal review supported the "needs improvement" rating. (*Id.* ¶41; R. 64, Resp. to Facts ¶41). But because they concluded that Musa had not regularly communicated with Rawal about his action plan (which was put in place following his 2004 mid-year review), they created an addendum to his 2004 annual review that says, "the basis for the rating was not clearly and consistently communicated." (R. 49, Facts ¶42.)

In the same letter to Rawal, Starz (via Fischer) also wrote that she had reviewed with Wing and Kevin Spars, manager of financial reporting at United, the accounts that Rawal questioned, the guidelines used for accounting practices, and the testing procedures for the account reconciliation process, and that these sources confirmed that Musa's accounting practices were "not inappropriate." (*Id.* ¶44.) Starz testified by deposition, though, that she did not recall reviewing the guidelines referenced in the letter, nor speaking with Wing or Spars. (R. 64, Resp. to Facts ¶44.) (United has submitted a declaration from Ed Rogowski, general auditor at United, stating that, based on his review, there had been no violations of Sarbanes-Oxley. (R. 49, Facts ¶45.))

Rawal's Application for a Position in the International Accounting Department

While awaiting the results of the internal investigation, Rawal sought a different position at United. Although he was on an action plan and had received a less than "successful" overall rating in his annual review, Rawal was able to apply for a position in the international accounting department as a senior staff representative, which carried a higher pay grade. (*Id.* ¶55.) The director of the department at the time—and the person responsible for the hiring

decision—was Rudolph Stewart.  Stewart had worked with Rawal before and encouraged him to apply for the position.  (R. 67, Exh. 2 at 202.)

Rawal interviewed on July 14, 2005 and August 15, 2005.  (R. 49, Facts ¶51.)  He scored a 4 and a 5 in the structured portion of the interview.  Sharon Kristensen, a staff representative in the staffing service center at United, testified by deposition that Rawal was a, if not the, successful candidate for the position.  (R. 65, Add'l Facts ¶27.)  She also acknowledged his high scores on his interviews in a September 7, 2005 e-mail to Janet Troyke, legal counsel for United.  (R.67, Exh. 20.)  And, according to notes written by Andrea Kent, senior staff representative for EEO compliance at United, Kristensen gave Kent the impression that the international accounting group was going to make the offer to Rawal.  (R. 65, Add'l Facts ¶27.)

Rawal did not get the job.  In her September 7 e-mail to Troyke, Kristensen sent "the hiring director's notes," which included an explanation that Rawal had not received the position because he had crossed the line "between following up and displaying overbearing and aggressive behavior," and that he had not demonstrated patience, consideration, or understanding in his post-interview demeanor.  (R.67, Exh. 20.)  In relaying the notes, Kristensen asked Troyke to let her know if she had any concerns "from a legal perspective" with the reasons given.  (*Id.*)  On September 15, 2005, Kristensen wrote to Troyke to add that, given Rawal's "need for development" in "communication, performance management and planning" (the areas in which Musa had given him ratings of "needs improvement" in the 2004 evaluation), he would be more qualified for the position after he established a track record of success in those areas.  (*Id.*)

According to Stewart's declaration, Rawal was denied the position because he was too aggressive in inquiring about the status of his application. (R. 49, Facts ¶52.)[2] Stewart states that Rawal was "pestering" him about the hiring decision, which Stewart says he found inappropriate. (*Id.* ¶53.) It's unclear whether Musa or anyone else outside the international accounting group spoke to Stewart about Rawal before Stewart made the decision not to hire him. (R. 65, Add'l Facts ¶27.) It's also unclear who else applied for the job and who ultimately obtained it.

<u>Rawal's Lateral Transfer to the Cargo Accounting Group</u>

When the position in the international accounting department fell through, Rawal sought a lateral transfer. Around September 15, 2005, Rawal interviewed for a staff accountant position in the cargo accounting department, and he accepted an offer to work there at his current pay level (a yearly salary of $45,120)[3] on September 28, 2005. (R. 49, Facts ¶54.) Rawal physically moved to the cargo accounting department over a month after he was hired there, on October 31,

---

[2] Rawal has filed a motion to strike Stewart's declaration, principally as a matter of fairness, because he was not able to depose him. He also moves to strike the portions of the declaration that are hearsay. United responds that Rawal conducted the ten depositions authorized without leave of court under Federal Rule of Civil Procedure 30, and that United did nothing to prevent Rawal from deposing Stewart, who is no longer a United employee and lives in London, England. In accordance with some of Rawal's objections, the court has excluded the statements in Stewart's declaration that are irrelevant, merely self-serving, or hearsay. The court declines to strike the declaration in its entirety, though, because there is no evidence that United prevented Rawal from deposing Stewart. His declaration, like any other sworn affidavit based on personal knowledge, is admissible for summary-judgment purposes. *See Oto v. Metro. Life Ins., Co.*, 224 F.3d 601, 604-05 (7th Cir. 2000).

[3] According to what appears to be an official United record, Rawal was hired at a yearly salary of $48,000, but his salary dropped 10% in January 2005 and then increased .08% in February 2005, to $45,120. (R. 50, Tab 3D.) The parties have not explained the reasons for these salary changes.

2005.  (*Id.*)  (The parties dispute whether the 32-day wait violated United's policy to transfer certain employees within two weeks of a hire; Fischer described two weeks as "standard" practice.)  (*Id.* ¶56; R. 65, Add'l Facts ¶23.)

Within days after Rawal accepted the offer in the cargo-accounting group, Musa says he "needed to hire an employee to take over [Rawal's] job duties," and that "the job requirements for the position needed to be modified to account for the Department's evolving responsibilities."  (R. 50, Tab 8 at 1.)  Musa said that, because the department "had already determined ownership responsibilities for most if not all accounts," the next step was to "implement more procedures, controls, and processes."  (*Id.*)  According to Musa, the "newly-created position required more complex work than an entry level Staff Accountant position" and demanded someone with "strong analytical skills, a systems and project management background, and operational business experience."  (R. 50, Tab 8 at 2.)  Musa changed the title of the newly open position to "senior staff accountant," with a grade level of "F" and a salary of $60,000.  (R. 65, Add'l Facts ¶18; R. 50, Tab 8 at 2.)

Musa did not approach Rawal about the position, and, although it was posted both internally and externally, Rawal was not alerted to the fact that it carried a higher salary than he had earned.  (R.67, Exh. 29; R. 49, Facts ¶60.)  Under United's transfer policy, Rawal was expected to remain in the cargo accounting department for at least one year before seeking a transfer elsewhere.  (R. 67, Exh. 10.)

United hired Mick Ilic, a Caucasian man, to fill the vacant position.  (R. 65, Add'l Facts ¶18.)  Ilic's résumé identified him as having a B.S. in accounting, with seven years of accounting experience, including most recently as a senior staff accountant for Bally Total Fitness.  (R.67,

Exh 16.)  To Musa's knowledge, Ilic is not a certified public accountant.  United sent Ilic an offer letter on October 3, 2005.  (*Id.*)  When Ilic began working for United, Musa required Rawal to return to the shared services group to train him.  (R. 65, Add'l Facts ¶20.)  According to Musa, that training involved "walking Mr. Ilic through some of the routine responsibilities that [Rawal] had previously performed while he was in the position." (R. 67, Exh. 18 at 39.)

<u>Rawal's Performance in 2005</u>

Throughout that time—from January to October 2005—Musa remained charged with evaluating Rawal's performance.  For the period before Rawal pursued his complaints (January to May), Musa gave Rawal an overall rating of "successful" in his mid-year review.  (R. 49, Facts ¶36.)  He noted that Rawal had "played a key role in the successful accomplishment of several important projects/objectives during the first part of 2005, including consolidation of the high risk account list into existing data files/reports/products, participation in and coordination of various account reconciliation testing activities, and implementation of a process to track the status of non-significant account reconciliations."  (R. 67, Exh. 14.)  According to Musa, Rawal "[s]uccessfully coordinated account reconciliation testing activities with the auditors – managing the information flow, providing them with the support they required, fielding their questions and assisting with follow-up on open issues."  (*Id.*)  Musa also wrote that Rawal "successfully addressed and implemented most prior constructive feedback to improve his overall level of performance," although he identified additional "[d]evelopmental opportunities" that could "further enhance [Rawal's]  performance and make him an even stronger contributor."  (*Id.*)  (In the version Rawal received, Musa also noted that Rawal had "reflected good judgment," although that compliment is omitted in a version on file at United.  (R. 65, Add'l Facts ¶14.))

After Rawal voiced complaints about the 2004 annual review and Musa's accounting practices, Musa offered a more negative assessment of Rawal's performance. Specifically, in Rawal's 2005 annual review, Musa evaluated Rawal's performance from January to October, and Donna Flood, manager of revenue accounting and Rawal's new supervisor in the cargo accounting group, evaluated his performance from November to December. (R. 49, Facts ¶72.) Rawal's performance from June to October apparently drove the overall rating; despite Musa's earlier rating of "successful" for January to May and Flood's rating of "successful" for November to December, Rawal received an overall rating of "needs improvement" on his 2005 annual review. (*Id.*) Gary Heinis, manager of cargo freight accounting, testified that both he and Flood believed that Rawal deserved an overall rating of "successful." (R. 65, Add'l Facts ¶10.) They expressed their disagreement with the lower rating to United's human resources personnel, including Kristensen. (*Id.* ¶11.)

Typically, the weight to be accorded to each "objective" and "success" factor in an employee's evaluation is determined at the beginning of each year during a goal-setting conference between an employee and his supervisor. (*Id.* ¶24.) That practice was not followed in Rawal's case. An unsigned draft of Rawal's 2005 annual review, dated February 22, 2006, states that Rawal was performing his duties adequately, and it includes an overall rating of "successful." (*Id.* ¶5.) Another draft, dated March 1, 2006, includes an overall rating of "needs improvement." (R. 107, Pl. App'x Exh. 24, Tab B.) The weights accorded to the objectives and success factors in these drafts varied. (R. 65, Add'l Facts ¶25.)

Putting aside his reviews, though, Rawal acknowledges that he made some mistakes in 2005. Among the thousands of e-mails he sent that year were a February 9, 2005 note in which

he apologized to Musa and two others for a mistake in the reconciliation of four accounts, an August 29, 2005 note in which he apologized to four employees because the numbers in a report "were incorrect," explaining that he "had to go to a meeting so [he] rushed," and a September 16, 2005 note in which he apologized to four employees for mistakenly sending a July, rather than August, balance sheet variance report. (R. 49, Facts ¶¶ 24, 30, 31.) Rawal admits, too, that he could have handled two situations better: on August 3, 2005, he sent an e-mail, addressed to one employee and copied to three others, that he admits was "terse" and "tough"; and during a meeting on December 23, 2005, Rawal admits that he directed a forceful comment at Heinis. (*Id.* ¶¶28, 74.)

United responded to the latter two incidents in writing. In a September 2, 2005 e-mail to Rawal, Musa described the August 3 e-mail as "confrontational and argumentative in nature." Musa added that other employees had expressed concerns about Rawal's interactions with them, "although none [had] escalated to the level of this . . . incident." (*Id.* ¶46.) (Musa may have been referring to some complaints he received earlier in 2005 but did not mention in either of Rawal's reviews: on February 2, an employee informed Musa that she perceived an e-mail from Rawal to be a "bit rude" and wanted to discuss the issue with Musa; on April 1, an employee asked Musa to discuss an e-mail she received from Rawal because she was "not certain how to take [the] email," while another employee forwarded an e-mail written by Rawal that he described as "an inappropriate response to a simple issue"; and on August 11, a consultant told Musa that Rawal had become aggressive and confrontational with her, and that she had asked him to leave her work area. (*Id.* ¶¶23, 25, 26, 29.))

-12-

On September 15, 2005, Musa provided Rawal with a list of five web-based courses designed to improve communication skills, and he told Rawal to take two courses per week over the next few weeks. (*Id.* ¶47.) Rawal found three of the classes objectionable but acknowledged that the other two classes were good. (*Id.* ¶48.) One of the courses taught proper telephone etiquette, which Rawal believes is used to train employees at United's call centers in India (although he has not pointed to any evidence to substantiate that belief). Rawal completed three of the classes in December 2005 and the remaining two classes in March 2006. (*Id.* ¶49.) The longest class was 1-1 ½ hours, and Rawal completed all but one of the classes at work. (*Id.*)

As for the incident at the December 2005 meeting, nearly 2 ½ months later, on March 8, 2006, Rawal received a follow-up letter. (R. 65, Add'l Facts ¶33; R. 49, Facts ¶72.) The letter, signed by Heinis, referenced Rawal's "unprofessional and inappropriate" communications. (R. 49, Facts ¶70.) Heinis did not in fact write the letter, which he said Kristensen gave him to sign. More importantly, Heinis says he never observed Rawal exhibiting the behavior outlined in the letter. (R. 65, Add'l Facts ¶31; R. 67, Pl. Exh. 12 at 47-49.) Heinis also testified by deposition that he did not think Rawal's behavior during the December 23, 2005 meeting was significant enough to affect a performance evaluation. (R. 65, Add'l Facts ¶7; R. 67, Pl. Exh. 12 at 35-36.)

The ghost-written letter instructed Rawal to complete the web-based courses outlined in his developmental plan, and that his failure to do so would be a terminable offense. (R. 49, Facts ¶70.) He also was told not to communicate "in an inappropriate manner," but that this did not mean that he could not pursue complaints through United's internal processes. (R.67, Exh. 26.) Rawal was required to sign the letter and to agree to its terms or face termination. (R. 65, Add'l Facts ¶ 17.)

Musa also wrote a memorandum about a separate incident, the facts of which Rawal disputes. On November 1, 2005, Musa sent a letter to Rawal to memorialize an October 26, 2005 incident where, he wrote, Rawal approached him in an "aggressive and confrontational manner." Musa wrote that Rawal needed to work on his temperament and communication skills. (R. 49, Facts ¶50.) (In prior drafts of the letter, dated October 27, 2005 and October 31, 2005, Musa employed a more complimentary and less threatening tone. (R. 65, Add'l Facts ¶30.))

Rawal's Post-Transfer Experience at United

Although Rawal first complained about discriminatory treatment in an October 31, 2005 e-mail, he did not meet with United's equal employment opportunity (EEO) personnel until after he received his 2005 annual review, in March 2006. (R. 49, Facts ¶¶61-63, 72; R. 67 Exh. 11.) Megan Detzner and Andrea Kent, both senior staff representatives for EEO compliance, met with Rawal and investigated his complaints. (*Id.* ¶¶64-65.) They reviewed the allegations of harassment and retaliation set forth in his October 31, 2005 missive and in his attorney's January 17, 2006 letter to one of United's in-house attorneys, examined various documents, and interviewed Musa, Fischer, Stewart, Kristensen, and Flood. (*Id.* ¶65.) On May 15, 2006, Detzner and Kent informed Rawal that, according to their investigation, no violation of United's harassment and discrimination policy had occurred, and they found no evidence that the alleged retaliatory conduct was based on an improper retaliatory motive. (*Id.* ¶66.) Rawal internally appealed those findings without success. (*Id.* ¶¶67-68.)

Meanwhile, following the rating of "needs improvement" in his 2005 annual review, Rawal was placed on an action plan, which he completed. (*Id.* ¶75.) On March 23, 2007, Rawal received a "successful" rating on his 2006 annual review. (*Id.* ¶76.) Heinis described Rawal as

a "model citizen" in the cargo accounting department, and Flood said Rawal met the goals she had set for him. (R. 65, Add'l Facts ¶¶8,9.)

Rawal filed a charge of discrimination with the Equal Employment Opportunity Commission on April 10, 2006. (R. 49, Facts ¶78.) He voluntarily resigned from United in January 2008. (*Id.* ¶77.) His file at United contains a recommendation for reemployment. (R. 65, Add'l Facts ¶12.)

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in his pleadings or conclusory statements in affidavits; he must support his contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

### A.  Discrimination Based on Race, Color, or National Origin

A plaintiff can prove discrimination through the direct or indirect methods outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or he can combine both approaches. *Simple v. Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007).  No matter what path he chooses, the basic question is whether his employer discriminated against him based on a protected ground.  *Id.* at 671.

In its motion for summary judgment, United argues that Rawal does not have evidence—direct or circumstantial—to support any of his claims under the direct method.  In his response, Rawal does not contend otherwise; he proceeds only under the indirect method.  That approach places the burden on Rawal to make out a prima facie case of discrimination by showing that (1) he is a member of a protected class (2) who suffered an adverse employment action (3) despite the fact that he was meeting United's legitimate expectations, and that (4) United treated similarly situated employees who were not part of his protected class more favorably.  *See Maclin v. SBC Ameritech*, 520 F.3d 781, 787 (7th Cir. 2008).  United does not dispute that Rawal is a member of a protected class.  But the company argues that Rawal has not raised a genuine issue of fact on each of the other elements of his prima facie case.

The court begins, then, with whether Rawal suffered an adverse employment action. Rawal claims to have identified *five* such acts: (1) the failure to promote him to a senior staff representative position in the international accounting department; (2) the directive to take

communication classes, including extremely basic lessons in phone etiquette and handshaking; (3) the failure to transfer him within two weeks after he accepted a position in the cargo accounting department; (4) the "needs improvement" rating on his 2005 performance evaluation; and (5) the hiring at a higher pay grade of a Caucasian man with fewer credentials to replace him in the shared services group. (R. 49, Facts ¶5.) With the exception of the failure to promote Rawal to the international accounting group, United disputes whether any of these were adverse employment actions.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The requirement that a plaintiff show that he suffered an "adverse employment action" is a judicial gloss on the statute, and the term is broadly defined. *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006); *Maclin*, 520 F.3d at 787. The purpose of the requirement, which remains flexible, is "to distinguish between material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms or conditions." *Minor*, 457 F.3d at 634. Thus, the employer's action must be "materially adverse . . . meaning more than a 'mere inconvenience or an alteration of job responsibilities.'" *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique

to a particular situation." *Oest*, 240 F.3d at 612-13 (citation and quotation marks omitted).

The court agrees with United that the directive that Rawal take communication classes was not materially adverse to him. Although "humiliating, degrading, unsafe, [or] unhealthful" changes in an employee's work environment can be adverse employment actions, the change must be "significantly negative." *See Maclin*, 520 F.3d at 787-88. Here, although it may have been degrading to take communication courses that taught such basic things as how to answer a phone and shake someone's hand, Rawal admits that three of the five courses were "good," and that the longest course lasted between an hour and an hour and a half. Viewing the facts in the light most favorable to Rawal, then, for a total of three hours he was subjected to condescending tutorials. That temporary humiliation, while unfortunate, was not a "significantly negative" change in his workplace. Its brevity forecloses a claim that it was anything more than a "mere inconvenience." *See Oest*, 240 F.3d at 612.

The court also agrees with United that the delay in Rawal's transfer to the cargo accounting department was not an adverse employment action. Viewing the evidence in the light most favorable to Rawal, the 32-day delay in his transfer may have contravened United's policy of transferring employees within two weeks. But the transfer was lateral, meaning Rawal suffered no loss in pay or benefits by remaining in the shared services group. And nothing in the record suggests that the additional 17-day wait had a material effect on Rawal's professional development. *See Maclin*, 520 F.3d at 790. The delay, like the communication courses, was at most a "mere inconvenience." *See Oest*, 240 F.3d at 612.

The "needs improvement" rating in Rawal's 2005 annual review is a somewhat closer call. Typically, "negative performance evaluations, standing alone, are not cognizable adverse

employment actions." *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008). But Rawal did submit evidence that, under United policy, receiving a "needs improvement" rating precludes an employee from applying for a promotion. Thus, if that policy had been enforced to Rawal's detriment, then receipt of the rating, combined with the tangible consequence of a denied promotion, could constitute an adverse employment action. *See Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004). But Rawal admits that the policy was not strictly enforced; after all, following the "needs improvement" rating on his 2004 review he was allowed to apply for a promotion. More importantly, Rawal has not shown that he suffered *any* tangible consequences—for example, the denial of a promotion or a raise—as a result of his 2005 annual review. On this record, the "needs improvement" rating did not effect any change in the terms or conditions of his employment. *See de la Rama*, 541 F.3d at 686. Accordingly, it was not an adverse employment action under Title VII.

That leaves the hiring of Ilic to replace Rawal. And here United contends that, because Rawal did not apply for the "new" position in the shared services group, he cannot claim he was adversely affected by United's selection of Ilic. That might be true if Rawal were advancing a traditional failure-to-hire or failure-to-promote claim. Compare *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738-39 (7th Cir. 2006) (employee who does not apply for vacancy cannot establish prima facie case of discrimination without evidence that employer deterred her from applying), with *Simple*, 511 F.3d at 671 (employer's lack of knowledge that plaintiff sought vacancy does not foreclose failure-to-hire claim). But Rawal's claim does not fit squarely into either category.

The essence of Rawal's claim is that, immediately after he vacated his position in the shared services group, Musa revalued the work he had been performing at a substantially higher pay grade. Of course, according to United, the job changed. But a jury reasonably could conclude that the "new" job entailed substantially the same responsibilities as the "old" job. Indeed, there is no evidence that the "new" position involved responsibilities different from or additional to the tasks Rawal had performed. According to Musa, he "needed to hire an employee to take over [Rawal's] duties." And though he did say that the newly conceived position would require "more complex work than an entry level Staff Accountant position," he did not say that it was more complex than the work Rawal had performed. In fact, whatever skills the job may have demanded, Musa needed Rawal to train Ilic. Musa said Ilic's training involved Rawal "walking Mr. Ilic through some of the routine responsibilities that [Rawal] had previously performed while he was in the position," which suggests substantial, if not complete, overlap in responsibilities.

If a jury finds that the job duties remained essentially the same, then revaluing Rawal's former position is more akin to, if not the same as, denying him an earned raise. *See Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000) (denial of earned raise is adverse employment action under Title VII); *Power v. Summers*, 226 F.3d 815, 819-21 (7th Cir. 2000) (award of comparatively smaller "catch-up" raise is adverse employment action). And, clearly, depriving an employee of compensation that he otherwise would have earned is an adverse employment action under Title VII. *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007). Accordingly, there is a genuine issue of fact whether the substantial increase in the value of Rawal's position (from $45,120 to $60,000, a 33% increase), immediately after he vacated it,

was a material change "with respect to his compensation."  *See* 42 U.S.C. §2000e-2(a)(1);

*Minor*, 457 F.3d at 634.

Having discerned two adverse employment actions, the court next considers the

remaining prongs of the *McDonnell-Douglas* test in the context of each action, beginning with

United's failure to promote Rawal to the international accounting group.

### 1.  Failure to Promote Rawal to the International Accounting Group

On this claim Rawal encounters an insurmountable hurdle in showing that similarly

situated employees of a different race, color, or national origin were treated more favorably.

Although that requirement is flexible, Rawal still had to identify an employee with "sufficient

commonalities on the key variables . . . to allow the type of comparison that, taken together with

the other prima facie evidence, would allow a jury to reach an inference of discrimination."

*Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008).

But Rawal has not identified *anyone* who applied for the position in the international accounting

group—or for any other promotion—let alone the successful candidate.  Instead, Rawal simply

insists that *no one* is comparable—a contention that defies belief, given United's size.  He names

Ilic and Mike O'Malley, an accountant in the bank reconciliations group, but provides no factual

basis to support using them as comparators for this claim; indeed, he insists they are not

similarly situated.  (R.62, Pl.'s Br. 12-13.)

Summary judgment is the "put up or shut up" moment in a lawsuit, when the non-moving

party must highlight the evidence that would convince a trier of fact of his version of events.

*Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1111 (7th Cir. 2004).  Rawal's failure to identify any

employees who were treated more favorably dooms his discrimination claim based on United's

failure to hire him for the position in the international accounting group.  *See id.*; *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 (7th Cir. 2002).

2.  Revaluing Rawal's Position After He Vacated It

Rawal fares better on his claim that United discriminated against him by revaluing his position in the shared services group after he vacated it.  As explained *supra*, Rawal has the burden of proving that he was meeting his employer's legitimate expectations at the time, and that similarly situated persons of a different race, color, or national origin, were treated more favorably.  Rawal has established genuine issues on both fronts.

With respect to meeting his employer's expectations, United advances a broad-stroke evaluation of Rawal's performance throughout his tenure, pointing to (1) various e-mails alluding to Rawal's "inappropriate tone and/or mistakes"; (2) the fact that Musa gave him a "needs improvement" rating on three performance reviews; (3) the three written warnings he received; and (4) the fact that Musa put Rawal on a development plan based on his communication issues.  (R. 48, Def't's Br. 8.)

But Rawal's performance must be assessed at the time United revalued his position (around late September/early October 2005), and in the light most favorable to him.  *See Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005); *Fortier v. Ameritech Mobile Communs.*, 161 F.3d 1106, 1113 (7th Cir. 1998).  At that time, Rawal's acknowledged mistakes—the gravity of which neither side has addressed—were few: two in 2004 and three in 2005.  True, in the past month he had sent a "terse" and "tough" e-mail, which, combined with other incidents that Musa said he had not found significant enough to mention, led to the write-up and the communication development plan.  But those deficiencies must be weighed against

Rawal's "successful" rating on his most recent performance review, where Musa wrote that Rawal "successfully addressed and implemented most prior constructive feedback to improve his overall level of performance." That review is far more relevant than the "needs improvement" rating Rawal subsequently received in his 2005 annual review—an assessment that was influenced in part by subsequent incidents (including the other two written warnings) and disputed by Flood and Heinis. Considering Rawal's performance at the relevant time, there is a genuine issue whether he was meeting United's expectations.

Additionally, there is a genuine issue whether Rawal met the qualifications Musa cited for the "new" position. Musa said he needed someone with "strong analytical skills, a systems and project management background, and operational business experience." To the extent that those attributes were measured in Rawal's reviews, a jury could find he had them. In his 2004 annual review, Musa gave Rawal "successful" ratings in the areas of decision making, innovation, adaptability, business acumen, customer focus, and teamwork. And in his mid-2005 review, Musa wrote that Rawal had "[s]uccessfully coordinated account reconciliation testing activities with the auditors" and had "played a key role in the successful accomplishment of . . . consolidation of the high risk account list into existing data files/reports/products, . . . . various account reconciliation testing activities, and implementation of a process to track the status of non-significant account reconciliations." Finally, Rawal had performed his job well enough that Musa asked him to return to the shared services group to train his replacement. On the basis of these facts, a reasonable jury could conclude that Rawal had met United's expectations in the "old" position and possessed the qualifications Musa sought for the "new" position.

In addressing the fourth prong—that similarly situated persons were treated more favorably—Rawal all but shoots himself in the foot by asserting that no one was comparable. (Pl.'s Br. 12-13.)  But he does name Ilic, and he is an obvious and viable comparator, at least in the context of this claim.  After all, Ilic, who is Caucasian, was the successful candidate to replace Rawal.  *See Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 675-76 (7th Cir. 2003).  And both Ilic and Rawal dealt with Musa; he assessed Rawal's performance, revalued his position, and made the decision to hire Ilic.  Rawal's contention is not that he could not be compared to Ilic, but that he had vastly superior qualifications to Ilic. (R. 62, Pl.'s Br. 12.)  The jury can decide that question.  But for these purposes, Rawal and Ilic had similar enough educations, experiences, and qualifications to allow a "meaningful comparison."  *See Humphries*, 474 F.3d at 405.  Accordingly, Rawal has raised a genuine issue whether a similarly situated person was treated more favorably.

Having established a prima facie case of discrimination, the burden shifts to United to articulate a legitimate, non-discriminatory reason for the adverse employment action.  If United satisfies that burden, Rawal must then show that United's proffered reason is pretextual.  *See Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008).

Musa was responsible for changing the position's title and salary, and he says he did so because the job "needed to be modified to account for the Department's evolving responsibilities."  According to Musa, because the department "had already determined ownership responsibilities for most if not all accounts," the next step was to "implement more procedures, controls, and processes."  The "newly-created position required more complex work

than an entry level Staff Accountant position" and demanded someone with "strong analytical skills, a systems and project management background, and operational business experience."

Musa's explanation, if believed, is legitimate and non-discriminatory: a harder job demands a more skilled worker and higher pay. Accordingly, Rawal must show that Musa's explanation is pretextual—i.e., false. That means more than simply "faulty reasoning or mistaken judgment." *Argyropoulos*, 539 F.3d at 736. "An employer's explanation can be foolish or trivial or even baseless so long as it honestly believed the proffered reasons for the adverse employment action." *Id.* (internal quotation marks and citation omitted).

United offers no specific defense for Musa's explanation; it opts instead to highlight facts that it views as inconsistent with a finding of discrimination. Among them are (1) Musa's decision to hire Rawal, (2) Musa's attempt to obtain tuition reimbursements for Rawal's MBA classes, and (3) Rawal's belief that Musa previously had given him a "needs improvement" rating to ensure that he would stay in the shared services group. (R. 48, Def't's Br. 11.) But although these facts might tend to disprove a particular type of discriminatory animus, they are not necessarily inconsistent with pay discrimination. If a jury finds that Musa intended to discriminate against Rawal by paying him less than his Caucasian counterpart, it also could find that hiring Rawal (at a lower salary) and ensuring that he stayed under Musa's supervision would facilitate, or at least not hinder, that discriminatory aim. Meanwhile, Musa's attempt to obtain tuition reimbursements for Rawal, although inconsistent with pay discrimination, is not enough to eliminate this issue of fact.

Three aspects of the revaluation of Rawal's position, when considered together, could support a jury's finding of pretext: First, the change in salary occurred days after Rawal vacated

the position. A reasonable jury could view its timing as circumstantial evidence that Musa was motivated to increase the salary by Rawal's departure more than the department's "evolving responsibilities." *See, e.g, Filar v. Bd. of Educ.*, 526 F.3d 1054, 1064-65 (7th Cir. 2008) (suspicious timing can support inference of pretext). Second, the salary change was significant: a 33% increase, or $14,880. Given such a steep jump, one would expect evidence that the position entailed new or additional responsibilities beyond those Rawal performed. But, as explained *supra*, it's unclear that the duties changed at all. Third, a jury could find Musa's proffered explanation inconsistent with his deposition testimony that Rawal had to train Ilic in "the routine responsibilities that [Rawal] had previously performed while he was in the position." That testimony suggests that he considered it the same position and not a new one. *See Simple*, 511 F.3d at 671 (inconsistent explanations can support inference of pretext).

Finally, a jury reasonably could doubt Musa's suggestion that the change in salary was meant to attract a superior candidate for the position, given the choice of Ilic for the job. A jury may infer pretext from an employer's selection of someone with inferior qualifications to the plaintiff. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc). Here, although Rawal and Ilic had a comparable amount of accounting experience—approximately ten years for Rawal, and seven for Ilic—Rawal had the advantage of familiarity with the work in the shared services group (he'd worked there for more than a year and a half and trained Ilic for the position), along with being a certified public accountant with an advanced degree. Ilic, an outside hire, was not, to Musa's knowledge, a certified public accountant, nor did he have an advanced degree. *See Courtney v. Biosound, Inc.*, 42 F.3d 414, 423 (7th Cir. 1994) (hiring objectively less qualified candidate, who needed to be trained, is evidence of pretext).

From these puzzling aspects of United's decision, a reasonable jury could find that United's explanation for the change in salary was false, and that the real reason for its decision was pay discrimination based on Rawal's race, color, or national origin. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000). Of course, a jury might also find that the decision was made for legitimate reasons, or even that it was made for illegitimate reasons that are not actionable under Title VII (e.g., in response to Rawal's complaints about Musa's accounting practices). *See, e.g., Visser v. Packer Engineering Assocs., Inc.*, 924 F.3d 655, 657 (7th Cir. 1991) (en banc). But given a prima facie case of discrimination, along with an explanation that a jury reasonably could conclude was a lie, this claim is inappropriate for summary judgment.

### B.  Retaliation Based on Race, Color, or National Origin

To prove retaliation under Title VII, a plaintiff may proceed under modified versions of the direct and indirect methods outlined in *McDonnell Douglas*. The direct method involves a showing that the plaintiff's complaints about discrimination caused an adverse employment action. *Metzger v. Illinois State Police*, 519 F.3d 677, 681 (7th Cir. 2008). The indirect method requires a showing that the plaintiff  (1) engaged in protected activity under Title VII, (2) suffered an adverse employment action, (3) was performing his job satisfactorily, and (4) others who did not complain and were similarly situated did not receive the same treatment. *Id.*

Rawal argues that United retaliated against him after he used United's open-door policy and its internal complaint process by (1) demanding that he not use United's open-door policy or otherwise make his complaints known to senior management; (2) requiring him to attend

communication classes; and (3) threatening to terminate his employment if he did not agree to a performance plan. (R.49, Facts ¶6.)

As an initial matter, there is no evidence to substantiate Rawal's first claim. He points only to the March 2006 letter signed by Heinis, but the letter simply does not say that Rawal could not complain to senior management. Indeed, the letter explicitly states, "you are free to pursue any complaints that you have via United's internal processes as long as you conduct yourself in a professional and civil manner." (R. 67, Exh. 26 at 2.) Accordingly, there is nothing in the record to support Rawal's assertion of a "gag order."

As for United's directive that he take communication classes, Rawal cannot succeed on this claim because he had not yet complained about discrimination when he was ordered to attend the classes. Although as early as April 2005 Rawal had complained about Musa's accounting practices, and in May 2005 about his 2004 annual review, Title VII protects an employee who complains about discrimination based on specific, protected grounds—it does not protect all varieties of complaints. *See Nair v. Nicholson*, 464 F.3d 766, 769 (7th Cir. 2006); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000). Viewing the facts in the light most favorable to Rawal, he did not complain about or even suggest discrimination until October 31, 2005. He was ordered to take the communication classes on September 15, 2005—more than a month beforehand. Accordingly, his second claim fails as a matter of law.

Finally, Rawal simply asserts that his complaints caused United to threaten him with termination if he did not complete his performance plan (i.e., the communication classes he was told to take in September 2005). But Rawal cannot prove his claim under the direct method

because he has pointed to no evidence, direct or circumstantial, that United made the threat *because* Rawal complained about discrimination.  *See Moser,* 406 F.3d at 904-05.  And Rawal cannot prove his claim under the indirect method because, among other things, he has not even attempted to identify a non-complaining employee who was treated more favorably.  *See id.* at 205.  Thus, this claim, too, fails as a matter of law.

## IV. CONCLUSION

United's motion for summary judgment is GRANTED in part and DENIED in part. The court DENIES as moot Rawal's motion to strike United's responses to his statement of additional facts.  The court GRANTS in part and DENIES in part Rawal's motion to strike the declaration of Rudolph Stewart.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

Dated: **November 12, 2008**